JUDGE FLEMING
concurred with JUDGE TUCKER, and was for reversing the judgment of the District Court.
But a rehearing being asked for by the counsel for the appellant, on the ground of novelty and difficulty in the case, it was granted by the Court. On which motion, JUDGE TUCKER delivered the following opinion:
JUDGE TUCKER. I am not surprised at the present motion, and still less am I disposed to take offence at it. It is very natural for parties litigant to believe their own cause just; still more so where they had a judgment in their favour; and most of all, perhaps, where there has been a division in the opinions of the members of the last tribunal to which they can appeal. All these considerations have, no doubt, had their weight in bringing forward a motion for a rehearing of this cause, decided not without great deliberation by all the members of this Court, and by none with more than by myself. I have given that opinion which my best judgment and consideration have enabled me to pronounce, and so thoroughly satisfied am I with that opinion, that nothing which I have heard in opposition to it has hitherto 'shaken it, in the smallest degree, nor would any apprehension of the censure of the bar, or the wise and good in this, or any future age, induce me to grant the motion. To that tribunal, and to a still higher, whenever called before it, I trust whatever may be the errors of my understanding, I shall exhibit a heart immaculate (in my public conduct) as an angel of light. No consideration of that kind either hath, or will ever have, any weight with me. The only circumstance which induces me to grant the motion is the present constitution of this Court; *749 the possible operation of law upon that constitution, whenever the Court, as at present organized, is full; and the absence of a ^highly respected member of it, who may possibly, at the next term, be able to aid us with his counsel. And should it fortunately so happen, that he should be then well enough to assist our deliberations, although no change of opinion should take place among any of the members now present, his opinion will either confirm the judgment which has been already rendered, or affirm that of the District Court. In either event, I shall be perfectly satisfied, neither feeling any bias towards any of the parties, to all of whom I am a perfect stranger, nor that pride of opinion which cannot brook a decision against it.
I shall only add, that I hope the whole report (1) of this case, so far as it has proceeded, will be published among the proceedings of the present term. For, it is by no means my wish to shrink from censure, if the opinion I have delivered shall be found to merit it.
JUDGE ROANE verbally declared that as he had differed in opinion with the other Judges, he wished to be excused from giving an opinion on the motion for a rehearing ; but would refer the question to the decision of the other members of the Court.
XJUDGE EEEMJNG expressed his willingness to hear the cause re-argued.
After the re-argument at April term, 1809, the Judges again delivered their opinions.
JUDGE TUCKER. In the argument of the cause at the present term, it has been insisted on the part of the appellees, that if the Court feel any difficulty upon the fact of revocation, they ought to remand the cause to the inferior Court, with direction to impanel a Jury to try an issue of revo-cavit vel non, to be made up between the parties.
To this it has been answered by the counsel for the appellants, that the probate of wills was, in England, a matter of ecclesiastical cognisance, and the proceedings therein originally derived from the civil law, and not from the common law. That in these Courts the trial has always been per testes, and not by a Jury, to which they were perfect strangers. That our statutory provisions and regulations for a century past are conformable to the proceedings in those Courts; vide E. V. 1711, c. 2, 1748, c. 3, 1785, c. 61, 1794, c. 92. That the provision contained in the 11th sect, of the last mentioned act presupposes the will, whose validity is contested, to have been proved and admitted to record, in the same manner : and that the same is confirmed by sect. 12, which provides, “that on all trials by a Jury to be had according to the provisions of the preceding section,” the certificate of the oath of the witnesses at the time of the first pro bate, shall be admitted as evidence, &c. These reasons are perfectly convincing to my mind, that a County or other Court, (though it may also have common law jurisdiction,) when sitting as a Court of Probate, must proceed according to the ancient and invariable course of the civil law; and cannot avail themselves of their common law jurisdiction, in common law cases, to pursue or to direct any other course whatsoever. For it is the cause, not jurisdiction of the Court, which marks out the course of proceedings; and it would be no less a violation of the principles. of jurisprudence, *for the Court to refer the execution of a will, or of a declaration in writing, purporting to be a revocation of the same, to the decision of a Jury, instead of deciding it themselves, than it would be for the Court, sitting as a Court of common law to undertake to try an issue on a matter of fact, joined between the parties. Nor do I conceive this Court could mistake its own powers more in directing such a course of proceeding as just mentioned, to be had in a common law case, than by directing a Jury to be impanelled, as proposed, in the present case.
With respect to the merits; I have reviewed the evidence, have deliberated on the arguments of counsel, and revised and considered the opinion I formerly gave. And finding no reason to' change it, in any respect, I can only repeat, that I am of opinion, as formerly, that t’he judgment of the District Court be reversed, &c.
JUDGE ROANE. On the 16th of November, 1799, Charles F. Bates executed, at Belmont, the will now in question. This will makes ample provision for his mother, and his father’s family. The whole body of the will, except the word “trouble,” is written on the first side of a sheet of letter paper, and in a fair and regular hand; whereas the concluding sentence, “In testimony whereof, I, Charles F. Bates, have set my hand and seal, at Belmont, this 16th of Nov. 1799,” is written in a more running and less correct hand. From this circumstance I infer, that the will had been previously and deliberately prepared by him, and was subsequently executed, at the time and place above mentioned. On the 23d of September, 180J., he executed a codicil respecting the purchase-money and title of Belmont, and, revoking his will, as to two negroes directed to be mami- *750 mitted, but not as to any thing else. This codicil, like the will, is also dated (under the name, and above the sig-natura of the testator) “23d September, 1801.” This codicil is sealed by the testator. It is also headed by him thus; “Codicil;” whence I infer that, when the testator intended to make a codicil he would denominate it one. It *makes material alterations in the will; and so comes properly within the definition of a codicil. It bears date near two years after the will, and, like the will, appears to have been written at leisure, and with a steady hand. It follows at a reasonable distance from the will on the same side of a sheet of paper, where there was ample room to insert it; whereas the postscript in question is with difficulty foisted in, at the bottom of the quarter part of a sheet of letter paper; a place scarcely adequate to contain a sentence omitted through mistake, to be inserted in the will, which it immediately follows, and certainly not spacious enough to have been selected by any person, however niggardly in his temper or disposition, (of which, in relation to the testator, there is no evidence whatsoever,) for the insertion of a codicil, or a subsequent and independent declaration revoking the will in question.
This will and codicil shew a firm and steady purpose, in the testator, existing for a gréat length of time, to provide for his mother and his father’s family; a purpose which was never renounced by him up to the time of his death, as is abundantly proved by the testimony: they shew also, another circumstance, very important in this case; and that is, that, when a codicil was executed at a time subsequent to the date of the will,, the testator thought it necessary to annex the proper date to that codicil; the omission to do which, in relation to the postscript in question, seems conclusive to shew, according to the testator’s own ideas on the subject, that that postscript was written at the same time with the will. This will and codicil, providing amply for the mother and familj*, as aforesaid, was folded up in the form of a letter, sealed with three seals, and indorsed, in the manner of directing a letter, “Caroline M. Bates.”
The cancelled will in question is folded up and indorsed by the testator, “C. F. Bates’s will.” It is not indorsed C. F. Bates’s will and codicil: whence the idea would seem to be repelled, of its being more than one instrument. The same inference also seems to result, from heading and ^commencing the instrument thus: “This last will.of Charles F. Bates, written with his own hand, at Richmond, the 2d day of September, 1802:” and there is no other date to it than the above; there is none at the end of either the will or the postscript. I infer, from these circumstances, both the testator’s own idea that this writing all formed but one instrument; —his “last will and testament,” and that the date prefixed as above, ran through, and applied to both writings. It is a very reasonable and natural construction that a writing, without a date, immediately following one which is dated, will be taken to be written at the same time; especially if, from the contents of the last writing, it is evident it was meant to supply some defect or omission in the former: if, as in this case, the instrument only contains the mere formal and drag-net words of revocation used in almost all wills whatsoever; in that case one date is amply sufficient; for the writings are in fact, but one instrument. When to these circumstances, and especially the inference arising from the omission of a date to this postscript, or writing, (whereas one is annexed to the codicil to the established will as before mentioned,) we add the undoubted facts arising from inspection that the ink, appearance of the writing, and, even of the nib of the pen, seem precisely similar in the cancelled will and in the postscript; and that the smallness of the writing in the latter (which smallness also, is inconsistent with the idea of its being a distinct and substantive act of revocation) is accounted for by the want of room upon the paper, I am well satisfied that they were both written'at the same time: and, indeed, what is the postscript but a writing necessarily to be construed as a part of the will itself, it being nothing more than the formal declaration generally contained in all wills, and only put in after the signature of the main body of the will, because the testator had forgotten or omitted to insert it therein. It was added only through abundant caution by the testator. It is here to be remarked, that while the testator is proved to have spoken of a first and second will, he never spoke of a second codicil, *Or of any distinct revoking instrument. Thus, it is proved by Mr. Woodson, that the testator gave him to understand that his second will “was entirely destroyed,” and that his first will “was in force, and in the keeping of his mother.” This declaration of the testator is entirely inconsistent with the idea that the postscript did not fall together with the will; or that it was a subsisting and independent act of revocation. This postscript was not a codicil, because it neither adds to, nor diminishes from, the will to which it appertains, which forms the definition of a codicil; and because it is not headed “a codicil,” nor indorsed “a codicil,” nor ever mentioned or considered as a codicil bjr the testator: nor is it a distinct and substantial act of revocation; because an instrument of that character would have been more lengthy, particular, and explicit; it would not have been crowded in at the very bottom of the page, and in a small hand-writing; it would not have contained only the very sentence (and in the very words) which is usually added, and that only through abundant caution, at the end of a will before the signature of the testator. Being,’ therefore, neither a codicil nor a distinct act of revocation, and yet being something, it is undoubtedly a part of the will itself, omitted to be written therein, and afterwards written and resigned by the testator at the same time: the words “other” and “heretofore,” nec-cessarily attach it to the will which it immediately follows, and fix its writing and signing to have been at the same time with that of the body of the will. This postscript was therefore written at the same *751 time with the second will; but, at any rate, it was written before the cutting out of the name of the testator from it. I infer this, incontestibly, not only from the foregoing circumstances, but because in using the term “other wills,” it recognises this cancelled will as a subsisting will at the time, which it was not after the name was cut away; the postscript was therefore added (at any rate) previous to this act of cancelling, if it was not (as I have no doubt it was) coeval with the will itself, and written with the same pen.
*As to the cutting away the name to the will, and leaving that to the postscript, I will not say, but that, in the absence of all testimony, or in the event of a preponderance of testimony, that circumstance might be considered as amounting to a revocation pro tanto only; the consequence of which would be, that the postscript would be left in force. But there is a good deal of testimony in this case, in opposition to that idea, the effect of which must be considered; such testimony being entirely admissible and proper, as I shall presently attempt to shew.
If this postscript had been contained in the body of the will, and there had been only one signature, it is evident that the cancelling the last will would clear the way for the first, which would consequently be established. The doctrine in the case of Glazier v. Doe, 4 Burr. 2512, is in point on this subject. It is true that that report of the case does not say, expressly, that the last will had a clause of revocation in it; but, in the case of Goodright v. Harwood, 3 Wils. 508, one of the counsel said that it had ; and this was not denied by the Court or opposing counsel. This also was the case in Burtenshaw v. Gilbert;(a) and it was only the circumstance of the first will being can-celled, (and not on account of the existence of this clause of revocation,) that the will in that case was deemed to have no effect. As to such a clause of revocation, it also is liable to be revoked; and, being revoked, before the death of the testator, is as if it had never existed. In the sense and substance of the transaction, is there any difference between such a clause contained in the body of the will, and in a postscript, written at the same time, and considered by the testator as forming a part thereof; as forming, in fact, with the body of the will, but one instrument? A codicil “is reputed for part and parcel of a testament;” Swinb. 15, and will generally stand or fall therewith. This is equally the case, at least of different paragraphs of the same will, and this consideration, which could not have been unknown to the testator, (a lawyer,) will have its due weight, when we are considering quo animo the name was cut away in *ihe case in question: at the same time I readily admit that a codicil, or even one paragraph of a will, may be retained, while the will, or the residue of the will, as the case may be. may be revoked or cancelled. I consider this postscript, therefore, as not an independent declaratory act of revocation, (for no such declaratory act was ever, since the creation of the world, written in so few words on so small a space of paper, in the mere formal words of a common clause of revocation, or, in short, couched in the terms of an unsealed, undated, and paltry postscript,) but as predicated on the will then made, and a part thereof, and liable to stand or fall by that will’s being cancelled or suffered to take effect. There is no evidence (but to the contrary) that the testator meant to die intestate: but even considered as an independent declaratory act, written prior to the act of cancellation, it was still liable to revocation by that or any other competent act, and the question is, whether, even considered in that point of view, it was not revoked by the act of cancelling we are now considering.
As touching the question of revocation, there is no doubt but that parol evidence is admissible. It is admissible as well to shew that a complete defacing of the instrument, was not intended as a revocation, as that an act short of cancelling, defacing, burning, or obliterating, was so intended: the result, in both cases, will be governed by the intention, and not merely by the act itself. The case of the ink thrown upon a will by mistake, and which, although it obliterates and defaces, does not cancel it, is an instance of the first kind ; and the case of Mole v. Thomas, (b) where the will being neither torn through nor burned, but both having been intended, was held to be revoked, is an instance of the latter. So any other equivocal act; equivocal as to a total or a partial revocation, is subject to be explained by similar testimony. Revocavit vel non is similar to the question of devi-savit vel non, and is a question of fact for the consideration of the Jury, (c)
As this question respecting the admissibility of parol evidence in cases like the present, is very important, and, *in my view of the testimony in this cause, repels the presumption of revocation beyond a possibility of doubt, I will go into it -rather more at large.
In the case of Brady v. Cubitt,(d) Bord Mansfield laid it down, that the presumption of revocation was liable to be rebutted by “every kind of evidence:” and Buller, J., said that implied revocations must depend on the circumstances at the time of the testator’s death; which circumstances, I presume, cannot be known without a resort to parol testimony.
In Wilcox v. Rootes, (e) this Court, sitting as a Court of Probate, not only went into the whole question of implied revocation, and decided that the will was revoked by a subsequent marriage and birth of a child; (which ground of revocation could only have been proved by parol evidence;) but relied on evidence stated in the record, shewing that the testator, the night before his death, expressed a desire to make provision for the devisee ; whence was inferred the testator’s opinion and belief, that the will was not subsisting, but revoked. In that case, by way of *752 exception from the general doctrine that marriage and the birth of a child operated as a revocation of the will, the appellee had shewn in evidence, that he was a rec-ognised natural child of the testator; and the parol evidence last mentioned was intended to do away any result arising from such ground of exception; so that there was a parol evidence, on both sides, and such evidence was commented and relied on bj' the Court. In the opinion of the Court, as delivered by the President, it is relied on in favour of the revocation, that the testator did not, after the birth of the child, “republish his will, or signify an intention that it should be established, or have any force or effect after that period,’’ but that his mind was inclined otherwise, as appeared from the testimony. If, in that case, (like the case before us,) after the supposed act ot revocation had taken place, the testator had signified an intention that the will should still operate or have effect, if he had acknowledged it as a subsisting will, the marriage and birth of a child notwithstanding, undoubtedly a different decision *would have been given by the Court. This case, however, is conclusive, both to shew that the Court of Probate can go into the whole question of implied revocation, and, in doing so, is at liberty to repel or support the presumption of revocation by parol evidence.
In the case of Warner v. Matthews, (a) evidence was received, in opposition to the probate of a will, that a subsequent unfinished will was made by the testator; of many declarations of the testator shewing that he was not satisfied with the will before the Court; shewing the insanity of the principal legatee in that will; and that, since it was made, that legatee had also become very opulent, whence it was argued that the testator could not mean that will to stand: all this 'testimony was received and relied on without objection.
In Cogbill v. Cogbill,(b) it seemed admitted by the counsel on both sides, that paiol evidence was admissible in cases like the present, and such evidence was considered and relied on by the Judges.
In Temple & Taylor v. Temple, (c) the declarations of the testator, before his understanding became impaired, as to the manner in which he meant to dispose of his estate, and corresponding with the actual dispositions in the will, were relied on by one of the Judges to support the will, and overrule objections to the competency of the testator to make a testament.
In the case of Yerby v. Yerby, (d) a man having children by a former marriage, devised his whole property to them; he after-wards married, and had children, and died without altering his will: on the question whether the will was revoked or not, it was proved by a witness (inter alia) “that the testator, in his last illness, refused to alter his will when proposed to him, saying he wished some alterations to be made in his will, and that, when he got well, he would make them.” The Judges, in delivering their opinions, all quoted and relied on parol testimony. The first Judge who gave his opinion said, that the will so far from being considered by the testator as revoked, as being no will, was considered as a subsisting will, but one which *he intended to alter; (this is precisely the case of the will in question —see Woodson’s deposition;) that this was proved by Abner Dobyns; that a reference to a will as a subsisting one rebuts the presumption of revocation; and that an intention to revoke a will, and, much less, an intention to alter one, will not revoke it; and relied on the circumstances, (proved in the cause,) in support of the will, that the testator declared that his first children should not be injured by his second marriage, and'that he intended the land he lived on, even after the birth of his last child, for the sons of the first marriage: another and ulterior ground was taken by this Judge on general principles; but the other Judges were silent on it; namely, that the will being in favour of children the subsequent marriage, and birth of children, did not import a revocation of it.
JUDGE Fleming
said, that presumptive revocations may be rebutted by expressions in a will, or by circumstances; and that in the present case th^re -was abundant evidence that the testator, when about to marry, declared it should not injure his first children, and that, even after the birth of a son by the last wife, he was. heard to say he did not mean to give him any land, but to give him an education and send him to sea, and that these circumstances repelled the idea of revocation, even upon the principles of the English law.
JUDGE CARRINGTON
said, that presumption may be rebutted by circumstances, and that here the testator spoke of a desire to alter his will, not to revoke it; added to which, the testator had said he did not mean to give his second children any thing, but to educate and send them to sea; and that these circumstances destroyed the idea of revocation.

 It would Rave afforded the reporters real pleasure to comply with the request of the respectable Judge, could they have done It consistently with what they conceive to be a paramount duty to the public. To give a faithful detail of the decisions of the Court, is what they have professed, and what they have scrupulously en deavoured to perform. In doing this, their work has exceeded the limits originally contemplated. Were they to give a journal of cases agitated butnotdecided.it would only add to the mass of matter, without increasing the stock of public information. Besides, when the judges have agreed to reconsider a case, it would seem that their opinions on the first decision should be considered as if they never had existed, and cannot, with propriety, without their own request, or in the event of the second opinion agreeing with the ñrst, be published: for, to publish the whole proceedings in a cause, where a rehearing has been granted, would seem to bind down the Judges to abide by opinions which they had agreed to reconsider. We have deemed it proper thus to excuse ourselves for not publishing the whole report of the case, as it appeared at the October term, 1808. Another and very substantial apology would be, that considering the whole proceedings at October term as liable to be reviewed, and varied, by a subsequent decision, we did not take such notes of what fell from the Judges, as would enable us to report those proceedings with accuracy. — Note in Original Jfldition.

 Cowp. 54.

 1. Bl. Rep. 1043.

 Powell on Devises, 634; 3 Wils. 508.

 Dong. 49.

 1 Wash.

 Vesey.

 2 Hen. &Munf. 467.

 1 Hen. & Munf. 478.

 3 Call, 334.